IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES RYAN, and MEG-MARIE RYAN, husband and wife | * | |
| | * | |
| Plaintiffs | * | |
| v. | * | CASE NO.: WMN02CV240 |
| | * | |
| HARFORD MEMORIAL HOSPITAL, INC., et al. | * | |
| | * | |
| Defendants | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, Harford Memorial Hospital, Inc. and Upper Chesapeake Health Systems, by

their attorneys, Craig B. Merkle, Teri Kaufman Leonovich and Goodell, DeVries, Leech &

Dann, LLP, submit this Memorandum of Law in Support of their Motion for Summary

Judgment.

### I.     UNDISPUTED MATERIAL FACTS

At the time of the events in question, Mr. Ryan was a 48 year old with a prior cardiac

condition which caused him to have a defibrillator in place.  On September 13, 1998, while

stopping at a gas station with his family, Mr. Ryan had a cardiac arrhythmia and allegedly fell

and hit his head.  Mr. Ryan was transported by ambulance to Harford Memorial Hospital where

he was treated by the Defendants.  Although it is not documented anywhere in the medical

records, Plaintiffs allege that during the hospitalization, Mr. Ryan had severe bleeding from his

head and complained of a significant headache.  They further allege that they requested on

several occasions that a CT be performed, which was refused.

Mr. Ryan was discharged from the hospital on September 14, 1998 after treatment of his cardiac-related condition.  On September 16, 1998, Mr. Ryan was noted to have a change in mental status.  X-ray studies were performed which diagnosed a cerebral bleed.  Mr. Ryan was admitted to the hospital and underwent surgery to repair his cerebral bleed.

Plaintiffs allege that the Defendants failed to properly diagnose and treat Mr. Ryan's cerebral bleed.  There are no direct allegations of liability against Harford Memorial Hospital or Upper Chesapeake Health Systems.  Rather, the sole allegation of negligence against these Defendants is vicarious in nature, alleging that the emergency room physician, cardiologist, and intensivist (Drs. Benner, Lang, and Mathur, respectively) at the hospital were the agents of Harford Memorial Hospital and Upper Chesapeake Health Systems.

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that "summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A defendant moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984).  Where, as here, the non-moving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'-- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case."  Jones v. Ziegler, 894 F. Supp. 880, 888 (D. Md. 1996), aff'd, 104 F.3d 620 (4th Cir. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  This burden may be met by consideration of affidavits, exhibits, depositions and other

discovery materials. Id. A plaintiff must come forward with some minimal facts to show that a defendant may be liable under the claims alleged. Jones, 894 F.Supp. at 888; Parrot v. Chaney, 748 F.Supp. 312, 314 (D. Md. 1989), aff'd, 914 F.2d 248 (4th Cir. 1990) (citing Rule 56(e)).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Jones, 894 F.Supp. at 889 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 575, 586 (1986)). "[A] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." Barwick, 736 F.2d at 958-59 (quoting Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627, 640 (E.D.N.C. 1966)), aff'd, 388 F.2d 987 (4th Cir. 1967), cert. denied, 390 U.S. 959, (1968). A genuine issue of material fact cannot be created "through mere speculation or the building of one inference upon another." Jones, 894 F. Supp. at 889 (citing Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. Parrot, 748 F. Supp. at 314.

In the instant case, it is the Plaintiffs' burden to establish the existence of an agency relationship. Nat'l Mortgage Warehouse, LLC v. Bankers First Mortgage Co., 190 F. Supp. 2d 774 (D. Md. 2002).

### III.   ARGUMENT

A.   **Defendants Cannot Be Held Vicariously Liable For The Acts Of The Defendants Under A Theory F Respondeat Superior**

Vicarious liability imposes liability on one party for the actionable conduct of another based solely on the relationship between the two parties. Rivera v. Prince George's County Health Dep't.,102 Md. App. 456, 475, 649 A.2d 1212, 1222 (1994), cert. denied, 338 Md. 117,

656 A.2d 772 (1995).[1]  To establish an agency relationship, a plaintiff bears the burden of showing a principal/agent relationship such that:  (a) the agent is subject to the principal's right of control; (b) the agent has a duty to act primarily for the benefit of the principal; and (c) the agent holds the power to alter the legal relations of the principal.  State v. Cottman Transmission Sys., Inc., 86 Md. App. 714, 732, 587 A.2d 1190, 1199 (quoting Schear v. Motel Mgmt. Corp., 61 Md. App. 670, 687, 487 A.2d 204 (1985) (internal citations omitted)), cert. denied, 324 Md. 121, 596, A.2d 627 (1991).  An agency relationship may be actual, such as that between employer and employee, in which case an employer may be held liable for the alleged negligence of the employee under the doctrine of respondeat superior.

In this case, it is undisputed that Drs. Lang, Mathur, and Benner were not employees of Defendants, Harford Memorial Hospital and Upper Chesapeake Health Systems on September 13-14, 1998.  See Exhibit 1, Depo. Jay Lang, D.O. at p. 12; Exhibit 2, Depo. Rakesh Mathur, M.D. at pp. 7-8; Exhibit 3, Depo. Marian Benner, M.D. at p. 7.  Accordingly, there is no basis for holding the Defendants vicariously liable for the acts of Drs. Lang, Mathur, and Benner based on respondeat superior.

B.    **The Undisputed Material Facts Do Not Support A Finding Of Apparent Agency**

Plaintiffs also cannot establish that Drs. Lang, Mathur, and Benner were apparent agents of Harford Memorial Hospital or Upper Chesapeake Health Systems.  In order to recover under an apparent agency theory, the plaintiff must show:

> (1) they were mislead by appearances by [the defendant] into believing that [the defendant] was an [agent] of the [principal];

---

[1]    As this Court, sitting in diversity, shall decide this medical malpractice action pursuant to the laws of the State of Maryland, Erie R.R. Co. v. Thompkins, 304 U.S. 64, 78 (1938), Defendants have cited relevant Maryland law regarding agency.

-4-

(2) this belief was objectively reasonable under all the
circumstances; and
(3) they relied on the existence of that relationship in making their
decision to entrust [the agent].

Chevon v. Lesch, 319 Md. 25, 34-35, 578 A.2d 840, 845 (1990)  These legal principles were

reaffirmed in Jacobs v. Flynn, 131 Md. App. 342, 284, 749 A.2d 174,196 (2000).  In Jacobs, a

medical malpractice case, the Court of Special Appeals held that the trial court correctly

instructed the jury that in order to find the hospital vicariously liable for the alleged negligence

of Dr. Flynn, a physician who had allegedly misinterpreted a bone scan performed at the

defendant hospital, they must find:

> There is apparent authority under the law only if [the hospital] by
> its words or actions cause [sic] Mr. Jacobs to believe that Dr. Flynn
> was an employee of [the hospital], and that this belief by Mr.
> Jacobs was objectively reasonable under all the circumstances and
> that Mr. Jacobs relied upon the existence of that relationship when
> deciding to submit to treatment by Dr. Flynn.

Id. at 383, 749 A.2d at 196.  See also,  Nat'l Mortgage Warehouse, LLC, 190 F. Supp. 2d at

780; Hofherr v. Eli Lilly & Co., 853 F.2d 259, 262 (4th Cir. 1988) (each applying these same

legal principals regarding apparent agency).  In the instant case, Plaintiffs cannot prove that they

were somehow misled by the Defendants into believing the Defendant doctors were employees

of the hospital or that they relied upon the appearance of an agency relationship between Drs.

Lang, Mathur, and Benner and the Defendants in seeking and obtaining treatment.

Maryland courts have addressed the issue of the acts of a hospital necessary to mislead a

Plaintiff into believing that a physician is its agent.  In Hetrick v. Weimer, 67 Md. App. 522,

508 A.2d 522 (1986), rev'd on other grounds, 309 Md. 536, 525 A.2d 643 (1987), the court

addressed allegations of apparent agency against Anne Arundel General Hospital regarding co-

defendant, Dr. Weimer, in his care of an infant born prematurely at the hospital.  Dr. Weimer

first came into contact with the plaintiff, Mrs. Hetrick, while she was in the operating room at

Anne Arundel General Hospital just prior to delivery of the child.  Although Dr. Weimer

introduced himself to Mrs. Hetrick as the pediatrician who was to care for her baby, the court

held that there was simply no evidence of any words or conduct on the part of the hospital that

could have induced Mrs. Hetrick to believe that Dr. Weimer was the hospital's agent.  Id. at

533.  The mere fact, therefore, that Mrs. Hetrick had received treatment from Dr. Weimer while

at the hospital was not sufficient to establish an apparent agency relationship between a

physician and the hospital.  Thus, the Hetrick court held:

> Mrs. Hetrick may have assumed that Dr. Weimer was from the
> hospital, but not on the basis of anything the hospital did to foster
> that belief.

Id. at 534.  See also, Hofherr, 853 F.2d at 780 ("a court will look only to the conduct of the

principal in determining a claim of apparent agency").

As in the Hetrick case, Defendants Harford Memorial Hospital and Upper Chesapeake

Health Systems in no way acted, by words or conduct, to induce the Plaintiffs into believing that

Drs. Benner, Lang, or Mathur were its agents.  There is absolutely no testimony that any

conduct of Harford Memorial Hospital or Upper Chesapeake Health Systems caused Plaintiffs

to believe the Defendant doctors were their agents.  In fact, Mrs. Ryan testified:

> Q:    Mrs. Ryan, my name is Teri Leonovich.  I take it that when your husband
>       was taken to the hospital, you didn't choose that hospital?
>
> A:    No.
>
> Q:    You went there because the ambulance took him to the nearest hospital?
>
> A:    Yes.
>
> *       *       *

Q:      Did you give any thought when your husband was being treated at Harford
        Memorial Hospital as to whether or not the physicians were employees of
        the hospital?

A:      No.

Q:      So it didn't matter to you one way or the other whether they were
        employees or whether they were physicians with privileges at that
        hospital?

A:      To be honest, ma'am, I didn't give it a thought.

Exhibit 4, Depo. Megan Ryan at pp. 128-130.

Thus, by Mrs. Ryan's own testimony, there were clearly no representations made by any

of the Defendants which caused her to believe that the Defendant physicians were employees of

the Hospital.  To the contrary, Mrs. Ryan simply gave "no thought" to this issue whatsoever.[2]

Similarly, the undisputed material facts clearly establish that there was no reliance

whatsoever upon a belief in an employment relationship between Drs. Benner, Lang, and

Mathur and the Hospital when Plaintiffs sought treatment at Harford Memorial Hospital.

Rather, Mr. Ryan was transported by ambulance to Harford Memorial Hospital and Plaintiffs

did not specifically seek treatment at Harford Memorial Hospital as opposed to any other nearby

hospital.  Additionally, based upon Mrs. Ryan's testimony, there was no consideration

whatsoever given by the Plaintiffs to whether or not the physicians providing treatment were

actually employees of the Hospital.

In Schear v. Motel Mgmt. Corp., 61 Md. App. 670, 487 A.2d 1240 (1985), the plaintiffs

stayed at a Holiday Inn Hotel owned by an independent franchisee of Holiday Inn, Inc.

("Holiday Inn") while visiting their children.  During their stay, valuable property was stolen

from their room.  The plaintiffs brought suit against the franchisee and Holiday Inn alleging that

---

[2] Mr. Ryan testified that he had very little, if any, recollection of his hospitalization at Harford Memorial Hospital.
Exhibit 5, James Ryan Depo. at pp. 23-24.  In fact, he had no recollection of discussions with any health care
providers at Harford Memorial Hospital. Id. at p. 39.

the franchisee was negligent, and the Holiday Inn was vicariously liable. Holiday Inn filed a summary judgment motion, stating that the franchisee was not its agent, and it therefore could not be held vicariously liable for the franchisee's negligence. The Circuit Court rejected the plaintiffs' argument that the franchisee was an apparent agent for Holiday Inn and granted the summary judgment motion.

The Court of Special Appeals affirmed, ruling that the franchisee was neither the actual nor apparent agent of Holiday Inn. Schear, 61 Md. App. at 687-88, 487 A.2d at 1248-49. Specifically, the Court held that "to prove agency by apparent authority or agency by estoppel, the Shears had to show that they relied on the name of Holiday Inn's Inc. in choosing to stay at this hotel." Id. at 688, 487 A.2d at 1249. The Court found that plaintiff failed to prove an apparent agency relationship because "there was no evidence that the Shears based their decision and stayed at the Chevy Chase Hotel on anything other than the proximity of the hotel to their daughter's home." Id.

As in Schear, it is also clear that Plaintiffs in this case did not rely on the appearance of agency between the Hospital and the treating physicians. Based on Mrs. Ryan's testimony, it was not even a subject of contemplation.

Plaintiffs will no doubt contend that an older case, Mehlman v. Powell, 281 Md. 269, 378 A.2d 1121 (1977), is dispositive in their favor. Mehlman is distinguishable from the case at bar, however, because unlike Mehlman, Plaintiffs did not consciously decide to go to Harford Memorial Hospital to obtain medical services. Rather, they were transported by ambulance and have conceded that they gave no consideration to the employment relationship of the physicians providing services to Mr. Ryan at the time he was receiving treatment. Despite the holding in Mehlman, subsequent Maryland cases have not relieved plaintiffs of the burden of establishing

that they actually relied on the existence of an agency relationship between the hospital and treating physician in making their decision to submit to the treatment of that physician.  See Hetrick v. Weimer, 67 Md. App. Md. App. 522, 508 A.2d 522 (1986); Jacobs v. Flynn, 131 Md. App. 342, 749 A.2d 174 (2000).

The undisputed evidence is insufficient to prove that the Defendants caused Plaintiffs to believe the defendant doctors were their agents or that Plaintiffs relied on the existence of an agency relationship between the treating physicians and the Hospital.  Accordingly, Defendants are entitled to judgment as a matter of law, as Plaintiffs cannot meet their burden of proof in establishing vicarious liability.

## IV.  CONCLUSION

For the reasons stated in this Motion and Memorandum, Defendants, Harford Memorial Hospital and Upper Chesapeake Health Systems respectfully request that the Court grant their Motion for Summary Judgment and enter judgment in favor of Harford Memorial Hospital and Upper Chesapeake Health Systems.

Respectively submitted,


Craig B. Merkle
Teri Kaufman Leonovich
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202
(410) 783-4000

*Attorneys for Defendants,*
*Harford Memorial Hospital, Inc. and Upper*
*Chesapeake Health Systems*

524998

-9-

1          THE UNITED STATES COURT FOR THE
                   DISTRICT OF MARYLAND
2

3  JAMES RYAN, and MEGAN RYAN,       : CIVIL ACTION - LAW
   husband and wife,                 :
4                      Plaintiffs    :
                                     :
5      v.                            : DOCKET NO.
                                     : WMN 02 CV 240
6  HARFORD MEMORIAL HOSPITAL, INC,;  :
   UPPER CHESAPEAKE HEALTH SYSTEM,   :
7  INC.; MIDATLANTIC CARDIOVASCULAR  :
   ASSOCIATES, P.A.,;                :
8  JAY LANG, D.O.;                   :
   RAKESH MATHUR, M.D.;              :
9  MARIAN BENNER, M.D.;              :
                      Defendant      : JURY TRIAL DEMANDED
10

11  _____

12                 Oral Deposition of

13                 JAY LANG, D.O.

14  _____

15

16       DATE:   Tuesday, September 17, 2002

17       TIME:   2:16 p.m.

18       PLACE:  Law Offices of Whiteford,
                 Taylor & Preston
19               210 West Pennsylvania Avenue
                 400 Court Towers
                 Towson, Maryland
20

21       TAKEN BY:  Plaintiffs

22

23          APEX REPORTING SERVICE
         By:  Sharon L. Dougherty
24            P. O. Box 6265
         Harrisburg, PA  17112-0265
25            717-545-3553



EXHIBIT
1
ALL-STATE® INTERNATIONAL

**11**

1  hospitals from '93 to the present?
2       A       St. Joseph's Medical Center.
3       Q       Where is that located?
4       A       It's in Towson.
5       Q       When were you affiliated with them?
6       A       I am thinking it was probably 1996 to '98,
7  somewhere around there.  I am not sure exactly.  There
8  was a period that I was -- needed to round down there.
9       Q       What exactly was your affiliation with
10  St. Joe's?
11       A       I was on staff there, basically helping
12  out other partners in that group.
13       Q       What happened in 1998?
14       A       Nothing in particular.  It's just that I
15  no longer needed to be there to round.  We were
16  shorthanded.  We needed extra staff to come in.
17       Q       Any other hospitals?
18       A       I did have privileges with the University
19  of Maryland.  I am not sure if I am still privileged
20  there.  It was -- I was a Clinical Instructor.
21       Q       What did you teach there?
22       A       I did not attend or teach anything there.
23  I did send patients there.
24       Q       Any other hospitals?
25       A       No.

**13**

1  Memorial Hospital back in '98?
2       A       No.
3       Q       How did you receive your privileges at
4  Harford Memorial Hospital?
5       A       I applied for privileges when I came to
6  Maryland.
7       Q       Do you have any formalized training in
8  emergency medicine?
9       A       I don't think I understand your question.
10       Q       Have you ever had a class specifically
11  geared towards emergency medicine?
12              MS. DOWNS:  In medical school or --
13              MR. MARSAR:  At any time.
14              THE WITNESS:  Yes.
15  BY MR. MARSAR:
16       Q       When?
17       A       Both in medical school and as a resident.
18       Q       How about after your residency, did you
19  ever take a CME or have any formal class that was based
20  on emergency medicine?
21       A       I have taken ACLS training and advanced
22  trauma life support as well which was in that realm.
23       Q       What is ACLS?
24       A       Advanced cardiac life support.
25       Q       When did you take the ACLS course?

**12**

1       Q       Harford Memorial Hospital, you were an
2  attending physician for them from '93 through when?
3       A       To present.
4       Q       Present?
5       A       I have active privileges.
6       Q       Back in 1998, were you considered an
7  employee of Harford Memorial Hospital, to your
8  knowledge?
9       A       No.
10       Q       An independent contractor?
11              MS. DOWNS:  Objection.  I don't know that
12  he could make that classification himself.
13              You can answer.
14  BY MR. MARSAR:
15       Q       Are you able to or no?
16       A       No.
17       Q       You are not able to?
18       A       I don't understand exactly what that is,
19  no.
20       Q       Did you have a written contract of
21  employment between yourself personally and Harford
22  Memorial Hospital back in '98?
23       A       No.
24       Q       How about your corporation, did your
25  corporation have a written contract with Harford

**14**

1       A       I have taken that repeatedly.  I am ACLS
2  certified.
3       Q       How about the advanced trauma course, when
4  did you take that?
5       A       I took that -- it's hard to say --
6  somewhere around 1990 or 1989.
7       Q       Did you become certified in anything as a
8  result of that class?
9       A       I was certified in advanced trauma life
10  support, yes.
11       Q       Do you have any other certifications?
12       A       No.
13       Q       Do you have any formalized training in
14  treating closed-head injuries?
15       A       I have training through my residency.
16       Q       About how many closed-head injuries have
17  you treated throughout the course of your career?
18       A       I don't recall.
19       Q       Could you give me an estimate?
20       A       It's really hard to say.  I really don't
21  recall a number that I could give you.
22       Q       Would it be more than a hundred?
23       A       I don't recall.
24       Q       Back in 1998, do you know whether Harford
25  Memorial Hospital had any written guidelines or

1            THE UNITED STATES COURT FOR THE
                DISTRICT OF MARYLAND

2

3  JAMES RYAN, and MEGAN RYAN,     : CIVIL ACTION - LAW
   husband and wife,          :

4              Plaintiffs     :
                           :

5     v.                  : DOCKET NO.
                           : WMN 02 CV 240

6  HARFORD MEMORIAL HOSPITAL, INC,; :
   UPPER CHESAPEAKE HEALTH SYSTEM,   :

7  INC.; MIDATLANTIC CARDIOVASCULAR  :
   ASSOCIATES, P.A.,;           :

8  JAY LANG, D.O.;              :
   RAKESH MATHUR, M.D.;         :

9  MARIAN BENNER, M.D.;         :
             Defendant     : JURY TRIAL DEMANDED

10

---

11

12              Oral Deposition of

13           RAKESH MATHUR, M.D.

---

14

15        DATE:   Tuesday, September 17, 2002

16        TIME:   10:05 a.m.

17        PLACE:  Law Offices of Whiteford,

18              Taylor & Preston
              210 West Pennsylvania Avenue

19              400 Court Towers
              Towson, Maryland

20

        TAKEN BY:  Plaintiffs

21

22

23      APEX REPORTING SERVICE
     By:  Sharon L. Dougherty

24        P. O. Box 6265
    Harrisburg, PA  17112-0265

25        717-545-3553

EXHIBIT

2

ALL-STATE® INTERNATIONAL

7

1  PhyAmerica, Incorporated.  In those days it was known
2  as Coastal Physicians, Incorporated.  The same company
3  is known as PhyAmerica, Incorporated now.
4        I was a full-time consultant and served as
5  a critical care specialist since October of 1996.
6        Subsequently in, I think, March of 1999, I
7  also started developing my private practice in chronic
8  pain management.  I have a clinic which is called
9  Intractable Pain Clinic.  As the practice picked up, I
10 cut down my time that I could devote to critical care
11 medicine.
12       Currently I am a part-time intensivist
13 with PhyAmerica, Incorporated and a part-time pain
14 management specialist.
15       Q    PhyMedical, Incorporated, is that on your
16 CV here?
17       A    PhyAmerica, Incorporated.
18       Q    Where is that?
19       A    I didn't write it down here, but I wrote
20 down Harford Memorial Hospital and UCMC.  These are the
21 hospitals which I am affiliated with.  But my employer
22 is PhyAmerica, Incorporated.
23       Q    That is currently your employer?
24       A    Yes.
25       MS. AYERS:  PhyAmerica has a contract with

8

1  the hospitals to provide, I guess, intensive care
2  services.
3        THE WITNESS:  Intensive care services and
4  ER services.
5  BY MR. MARSAR:
6        Q    So you are not an employee of any of these
7  hospitals that you have privileges with?
8        A    No.  No.
9        Q    Are you an independent contractor with the
10 hospitals?
11       A    Independent contractor with PhyAmerica,
12 Incorporated.
13       Q    Then PhyAmerica has contracts with the
14 hospitals --
15       A    Contracts with the hospitals, that is
16 right.
17       Q    -- for your services?
18       A    That is correct.
19       MS. AYERS:  Is that correct, that you are
20 an independent contractor with PhyAmerica?
21       THE WITNESS:  Yes.
22       MS. AYERS:  Yesterday you told me
23 employed.
24       So the Interrogatories are incorrect in
25 that respect then.  Consider those to be corrected.

9

1        THE WITNESS:  I'm sorry.
2        MR. MARSAR:  That is okay.
3        MS. AYERS:  Doctors don't make a big
4  difference between independent contractor and
5  employees -- employment, but attorneys do.  So --
6        MR. MARSAR:  That is okay.
7  BY MR. MARSAR:
8        Q    I would like to back up a little bit.
9        What is the Kaplan Training Center?  You
10 mentioned that you were there for a year or a year and
11 a half?
12       A    Yes.
13       Q    What exactly is that?
14       A    That is a place where a lot of
15 international medical graduates go, and after school
16 they attend there, where they help us train for
17 multiple choice question format of answering the Board
18 questions that we are not accustomed to.
19       Q    So that was kind of a prep course --
20       A    Prep course.
21       Q    -- for a Board exam?
22       A    Yes, prep course for the licensing exam
23 and the ECFMG exam that all international medical
24 graduates had to undertake at that time in order to
25 appear for the licensing exam.

10

1        Q    Can you describe that ESFMG exam?  How is
2  that given?
3        A    ECFMG -- it's called ECFMG, Educational
4  Council for Foreign Medical Graduates.
5        Q    Okay.
6        A    That examination, to the best of my
7  recollection, was a two-day exam, which was a multiple
8  choice question type exam, which covered all the
9  clinical material that is taught in the medical school,
10 and I passed that with, I think 78 and 82 percentile in
11 both sections.
12       It had a basic science component and a
13 clinical science component, and I passed both of them
14 in the first attempt.
15       Q    Then once you passed that exam, you were
16 able to take your --
17       A    FLEX --..
18       Q    -- your FLEX exam?
19       A    -- licensing exam.
20       Q    Okay.
21       A    I passed that also.  That, I think, had
22 three parts which was spanned over three days or so,
23 and I passed that also in the first attempt, with 82
24 percentile in both clinical sections.
25       Q    Are you board certified in anything?

1        THE UNITED STATES COURT FOR THE
              DISTRICT OF MARYLAND
2

3   JAMES RYAN, and MEGAN RYAN,      :  CIVIL ACTION - LAW
    husband and wife,                :
4                    Plaintiffs      :

5      v.                            :  DOCKET NO.
                                     :  WMN 02 CV 240
6   HARFORD MEMORIAL HOSPITAL, INC,; :
    UPPER CHESAPEAKE HEALTH SYSTEM,  :
7   INC.; MIDATLANTIC CARDIOVASCULAR :
    ASSOCIATES, P.A.,;               :
8   JAY LANG, D.O.;                  :
    RAKESH MATHUR, M.D.;             :
9   MARIAN BENNER, M.D.;             :
                     Defendant       :  JURY TRIAL DEMANDED
10

11

              Oral Deposition of
12
              MARIAN BENNER, M.D.
13

14

15

           DATE:   Friday, September 20, 2002
16

           TIME:   2:17 p.m.
17

           PLACE:  Law Offices of Mason,
18                 Ketterman & Cawood
                   69 Franklin Street
19                 Annapolis, Maryland

20         TAKEN BY:  Plaintiffs

21

22

           APEX REPORTING SERVICE
23         By:  Sharon L. Dougherty
                P. O. Box 6265
24         Harrisburg, PA  17112-0265
                717-545-3553

25



EXHIBIT

3

ALL-STATE® INTERNATIONAL

7

1  now. It looks like you were an emergency room
2  physician from 1990 through the present; is that
3  correct?
4      A    Yes.
5      Q    At Harford Memorial Hospital, correct?
6      A    Correct.
7      Q    Are you an employee of Harford Memorial
8  Hospital?
9      A    No.
10      Q    In 1998, who did you work for?
11      A    PhyAmerica Coastal Physicians.
12      Q    Do you know if PhyAmerica had a contract
13  with Harford Memorial Hospital back in 1998?
14          MS. KREMER:  Objection to form;
15  foundation.
16          Go ahead, if you know.
17          THE WITNESS:  Yes.
18  BY MR. MARSAR:
19      Q    Was that a written contract?
20      A    Yes.
21          (Ms. Leonovich entered the room.)
22          MR. MARSAR:  Hello, Teri.
23          Let the record reflect Teri Leonovich just
24  walked into the room.
25  BY MR. MARSAR:

APEX Reporting Service

---

8

1      Q    I see also you were staff physician for
2  Kirk Army Acute Minor Illness Clinic?
3      A    Yes.
4      Q    What were your duties as a staff physician
5  for them?
6      A    I was an attending physician there in the
7  clinic.
8      Q    For what, two years, three years?
9      A    Two years.  It's part time.
10      Q    Part time?
11      A    Yes.
12      Q    Why did you stop working there?
13      A    I didn't have enough hours.  I was too
14  busy.  I had children.
15      Q    From 1990 through '93, you were an
16  emergency room physician --
17      A    Correct.
18      Q    -- for Emergency Room Associates, Inc.,
19  correct?
20      A    Correct.
21      Q    Why did you stop working with them?
22      A    Because I got a full-time position at
23  Harford Memorial.
24      Q    All your jobs before Harford Memorial were
25  part time; is that correct?

APEX Reporting Service

---

9

1      A    Correct.
2      Q    So Harford Memorial Hospital was your
3  first full-time job as a physician?
4      A    Correct.
5      Q    I see you are board certified in internal
6  medicine; is that correct?
7      A    Correct.
8      Q    You are currently board certified in
9  internal medicine?
10      A    Correct.
11      Q    When did you become board certified in
12  internal medicine?
13      A    1994.
14      Q    '94?
15      A    Yes.
16      Q    Did you pass your boards on your first
17  attempt?
18      A    No.
19          MS. KREMER:  Objection.
20  BY MR. MARSAR:
21      Q    How many times did it take you to become
22  board certified in internal medicine?
23      A    I took the exam four times.
24      Q    Four times.
25          Did you ever attempt to become board

APEX Reporting Service

---

10

1  certified in anything else?
2      A    No.
3      Q    You did a residency in internal medicine,
4  correct?
5      A    Correct.
6      Q    That's enough of the employment history.
7          Do you have any formalized training in
8  treating closed-head injuries?
9          MS. KREMER:  Objection to form; and
10  foundation.
11          THE WITNESS:  Yes.
12  BY MR. MARSAR:
13      Q    Can you describe that for me?
14      A    Through my work in the emergency room.
15      Q    Have you ever had a formal class strictly
16  geared towards treating closed-head injuries?
17      A    No.
18      Q    Throughout your career, about how many
19  patients have you had an opportunity to treat who have
20  had closed-head injuries?
21      A    Many.
22      Q    Can you give me an estimate as to how
23  many?
24          MS. KREMER:  Objection to form;
25  foundation.

APEX Reporting Service



# COPY

## RYAN VS HARFORD MEMORIAL HOSPITAL

## DEPOSITION OF MEGAN RYAN

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

## ART MILLER & ASSOCIATES
## 111 SOUTH CALVERT STREET
## SUITE 2700
## BALTIMORE, MD 21202
Phone: 410-367-3838
FAX: 410-367-3883

**EXHIBIT**

4

ALL-STATE® INTERNATIONAL

Page 125

1  or not. I mean --
2      Q   Was there a scab on the back of his
3  head when he was seen by Dr. Gavora?
4      A   I'm not sure if was scabbed overnight.
5  It was like a large scrape, an abrasion across
6  the back of his head.
7      Q   After those couple of seizures that
8  you described, he did not have any further
9  seizures; is that right, as far as you know?
10      A   As far as I know I don't remember any.
11  I don't remember any.
12      Q   And did you say that he returned to
13  full-time work after the craniotomy, but before
14  the heart transplant surgery occurred?
15      A   He tried to go back to work. I don't
16  know if Jim actually went back full-time or not.
17      Q   But he did go back to work to the same
18  employer?
19      A   Yes.
20      Q   Was he making the same amount of money
21  or was he paid by the hour or salaried or what?

Page 126

1      A   You have to ask him how he was paid.
2  Was he bringing home the same paycheck? No, he
3  was not. Are you asking me if he was paid
4  hourly? I'm not sure he was paid hourly. I'm
5  not exactly sure of the payment arrangement.
6  I'm just not sure of what the payment
7  arrangement was, but it was not the same salary
8  prior to the injury.
9      Q   Do you claim there has been a change
10  in your marital relationship that you claim is
11  related to his hematoma and the craniotomy and
12  all of that?
13      A   Yes.
14      Q   You do?
15      A   Yes.
16      Q   What is that?
17      A   Our relationship in a sense has
18  changed. As I told you earlier, he's markedly
19  short tempered. There are things that he
20  couldn't do that he used to do. There are
21  things that -- the children will tell you if you

Page 127

1  get out in the car, plan on being there for
2  while because sometimes he doesn't remember
3  where he is going. He can't hang the Christmas
4  decorations. Me and Erin have to go out on the
5  roof to hang lights. He can't do that anymore.
6  He can't pick tomatoes in the garden because he
7  can't bend down.
8      Q   Do you recall him going down to
9  Shenandoah on a rafting trip?
10      A   Yes.
11      Q   He got severely sun burned in October
12  of 2000?
13      A   I'll defer to you if you know when it
14  is.
15      Q   It's just noted in the medical record
16  as October of 2000. Do you remember him doing
17  that?
18      A   Yes.
19      Q   And do you recall another time when he
20  was -- in July of 2000 when he chopped down
21  several trees?

Page 128

1      A   He was trimming trees in our back
2  yard.
3      Q   The medical report says he chopped
4  down several trees. He didn't do that?
5      A   No. We had trees removed, but he
6  didn't do it.
7      Q   Does he do a lot of that out in the
8  yard?
9      A   He tries to.
10      MR. MASON: Thank you, ma'am. That's
11  all I have.
12      EXAMINATION BY MS. LEONOVICH:
13      Q   Mrs. Ryan, my name is Teri Leonovich.
14  I take it when your husband was taken to the
15  hospital you didn't choose that hospital?
16      A   No.
17      Q   You went there because the ambulance
18  took him to the nearest hospital?
19      A   Yes.
20      Q   And as a nurse having practiced in
21  hospitals you are well aware that quite often

Page 129

1  the physicians at the hospital aren't actually
2  employees of the hospital, correct?
3      A    Okay.
4      Q    Were you aware of that at the time?
5      A    No.
6      Q    So the hospitals that you've worked at
7  the physicians were employees of the hospital?
8      A    Most of them, yes.
9      Q    They weren't physicians with
10  privileges who came to see their patients at the
11  hospital?
12      A    I guess so.
13      Q    Did you give any thought when your
14  husband was being treated at Harford Memorial
15  Hospital as to whether or not the physicians
16  were employees of the hospital?
17      A    No.
18      Q    So it didn't matter to you one way or
19  the other whether they were employees or whether
20  they were physicians with privileges at that
21  hospital?

Page 130

1      A    To be honest, ma'am, I didn't give it
2  a thought.
3      Q    You've talked about the one nurse who
4  changed the pillow for your husband in the
5  emergency room?
6      A    Mm-hmm.
7      Q    And she did that after starting an IV
8  or something to that effect?
9      A    Mm-hmm.
10      Q    And it's my understanding from your
11  testimony, that your husband complained to that
12  nurse that he had a headache?
13      A    Yes.
14      Q    And you recall only one nurse in the
15  emergency room?
16      A    That's the only person I remember,
17  ma'am.
18      Q    That's fine. Other than that nurse
19  changing the pillow, was there any other nurse
20  that you recall during your husband's
21  hospitalization observing any bleeding with

Page 131

1  regard to your husband's head?
2      A    The nurse up in ICU because I think
3  when they transferred him, if I'm not mistaken,
4  she changed the pillow case. I think she was
5  the one who changed the pillow case.
6      Q    So that happened immediately after he
7  was transferred to ICU?
8      A    Sometime, maybe not immediately after,
9  no. Immediately after I wasn't allowed in with
10  him. So it was sometime shortly after they had
11  him upstairs.
12      Q    Do you have any recollection as to how
13  much blood was on the pillow at that time?
14      A    The pillow case had blood and if you
15  are asking me to estimate it I can't. I have no
16  idea.
17      Q    You can't tell me the size of a dime
18  or quarter?
19      A    It was a smear, ma'am.
20      Q    Did you or your husband have any
21  conversations with that nurse at that time about

Page 132

1  your husband having a head injury or complaining
2  of a headache?
3      A    At some point in time with that nurse,
4  ma'am, he complained that he was having such a
5  headache that he asked for medicine for it and
6  she gave him some Tylenol.
7      Q    And that was the same nurse who had
8  changed the pillow?
9      A    I believe so, ma'am. I believe we
10  were assigned just one nurse up there, if I'm
11  not mistaken.
12      Q    Do you recall your husband being given
13  Tylenol on more than that one occasion?
14      A    I don't think so. I think it was just
15  the one time.
16      Q    Do you recall him complaining of a
17  headache to any of the nursing staff after that
18  one occasion where he got Tylenol?
19      A    I think she was the only nurse that
20  was there. I don't believe there were other
21  nurses. I don't remember other nurses. I think



COPY

---

RYAN VS HARFORD MEMORIAL HOSPITAL

DEPOSITION OF JAMES RYAN

---

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

## ART MILLER & ASSOCIATES
111 SOUTH CALVERT STREET
SUITE 2700
BALTIMORE, MD 21202
Phone: 410-367-3838
FAX: 410-367-3883

EXHIBIT

5

ALL-STATE® INTERNATIONAL

Page 21

1    Q    And that was because the first one
2  was -- because your symptoms got worse and they
3  did further evaluation and decided you needed a
4  pacemaker?
5    A    The first one was because my heart
6  rate was so slow and so they put in a pacemaker
7  so it would be at 72 beats and I think it was 70
8  or 72.
9    Q    And I think I asked your wife for the
10  names of all the people who were involved in
11  your care. Can you think of any doctors that
12  you've been treated by for your cardiac problems
13  that she did not list?
14    A    No.
15    Q    You think she got everybody?
16    A    Yes.
17    Q    And the second pacemaker she said was
18  because of your brother's death that led to it?
19    A    That led to it, yes.
20    Q    What is your understanding of what
21  happened then?

Page 22

1    A    To my brother?
2    Q    No. Well, I guess I would be
3  interested. What was his diagnosis?
4    A    He didn't have a diagnosis. He had
5  never seen a doctor.
6    Q    Did they do an autopsy?
7    A    Yes, but it was inconclusive as far as
8  exactly what the cause was.
9    Q    And then they did a further evaluation
10  of you?
11    A    Yes.
12    Q    And what did they find at that point
13  as you understand it?
14    A    I can't tell you the medical
15  specifics, but it basically came down to that it
16  was a good idea if I had a defibrillator.
17    Q    Let me take you to August of -- 1999?
18    A    '98.
19    Q    Do you have any recollection of what
20  happened at the gas station?
21    A    I remember getting out of the van. I

Page 23

1  remember starting to wash the window. I
2  remember the next thing looking up from the
3  pavement asking Meg to stop hitting my chest. I
4  have a vague recollection of some ambulance
5  drivers and then I'm pretty much a blank. I
6  have a vague recollection of being in an
7  emergency room, but I couldn't tell you if it
8  was when I first got there or later. I honestly
9  don't know, and then after that I don't really
10  recall much of anything. I can recall a minor
11  conversation after leaving the hospital of
12  saying something like gee, it's nice to be out
13  of the hospital.
14    Q    Meaning Harford Memorial?
15    A    Yes, and then that's it. I don't
16  remember anything.
17    Q    Do you remember having a headache at
18  any point in those few days --
19    A    No.
20    Q    -- from the gas station to the time
21  you were operated on?

Page 24

1    A    No. I don't remember my head bleeding
2  or anything like that.
3    Q    What is your next clear recollection
4  that you do have a good memory of what was going
5  on?
6    A    I remember being in Fairfax Hospital.
7  I remember being there. One of my great
8  recollections of it is reading the first five
9  pages of a Clancy novel a hundred times and the
10  reason is, I really enjoy his books, but I
11  couldn't for the life of me read that book.
12    Q    You never have read it?
13    A    No. I can read things like that now,
14  but it takes me weeks where it used to take me
15  days.
16    Q    Why is that?
17    A    I have to occasionally go back and I
18  don't understand what he's talking about. So I
19  might have to go back and read a chapter. His
20  books are building blocks where things that
21  happened in the first 20 pages come back again

Page 37

1    Q   Do you know if that's related to your
2  cardiac situation as opposed to your
3  neurological situation?
4    A   It would be related to my -- the only
5  reason I know it's related to my head as opposed
6  to my heart is I had it in between.
7    Q   You had what?
8    A   I didn't have it before I hit my head.
9  I had after I hit my head.  I had it before my
10  transplant.  If it was because of my
11  degeneration of my heart condition in the
12  period, I have no idea.
13    Q   Have you had any kind of evaluation or
14  treatment for these neurological problems?
15    A   You mean the idea of bending over and
16  standing up and being dizzy?
17    Q   No, your vision, hearing loss, the
18  hand-eye coordination, the inability to bend
19  over.  It sounds like you were released by your
20  neurosurgeon and nobody gave you any further
21  rehab or follow-up.

Page 38

1    A   I had some therapy done in the
2  hospital and I had that, but individual therapy
3  since then, not that I can recall.
4    Q   Has anybody suggested that you should
5  see a neurologist or physical therapist or
6  anybody to deal with any of these problems?
7    A   Not to my knowledge.
8    Q   Did you have an ownership interest in
9  that company you were working for before you got
10  sick?
11    A   No.
12    Q   Have you discussed any of this with
13  Dr. Pacifica?
14    A   I don't understand what you mean.
15    Q   I understand that you didn't talk with
16  Dr. Pacifica when you were in Harford Memorial,
17  but have you discussed it since with him, the
18  things that happened to you neurologically?
19    A   No.  I have to say one thing.  Danny
20  is my brother-in-law and we made an agreement.
21  He was at the hospital.  He happened to be on

Page 39

1  call the day I was diagnosed in 1984 -- in 1994
2  as a resident at Georgetown and within two days
3  we made an agreement that he would never treat
4  me as a doctor and I would never ask him a
5  question as a patient and we've kind of
6  continued that through the years.
7    Q   I'm sure you've answered this
8  question, but lawyers can't get things down a
9  hundred percent.  With regard to complaints of
10  headache or the bleeding or the size of the knot
11  or the degree of abrasions you had on the back
12  of your head, any of those details about your
13  symptoms after the fall you really can't tell us
14  anything?
15    A   No, I really don't remember any of
16  that.
17    Q   You don't remember talking to any of
18  the doctors at Harford Memorial or nurses I
19  assume?
20    A   Correct.
21    Q   Someone mentioned a Dr. Lewis, a

Page 40

1  rheumatologist.  Why did you see him?
2    A   It's a her.  We saw Dr. Lewis because
3  I had an elevated CK level and she is an
4  endocrinologist and she was looking to see if
5  there was anything in the medication I was
6  taking that could have been causing the elevated
7  CK level.
8    Q   And you were referred to her by your
9  cardiologist?
10    A   Yes.
11    MS. AYERS:  I'm running out of steam.
12  I'm going to let my colleagues inquire.  Thank
13  you.
14    EXAMINATION BY MR. MASON:
15    Q   I've gone through all the medical
16  records, sir, and I can't find a single
17  statement by a physician anywhere in your
18  medical records that you have a neurological
19  problem or that you have a vision problem or a
20  hearing problem.  Can you explain that to me?
21    A   No.